Thank you, your honors. My name is Elizabeth Griffin, and with me today is the legal director of the Montana Innocence Project, Brenda McQuillan. I'd like to reserve five minutes for my rebuttal, please. Just watch the clock, counsel. Thank you, your honor. Two main issues today we need to address. One is the timeliness of the motion for DNA testing. The second, if this court determines that the DNA testing request is timely, whether or not to order that that testing go forward. What is the good cause for the delay? If we don't go on newly discovered evidence, what is the other good cause? The good cause for the delay, your honor, is that the defendant himself, Mr. Watson, really did pursue all his remedies until approximately 2010 when the Montana Innocence Project came involved. He sought his appeal, he went through his collateral attacks, and when those were completed, he then sought out the Montana Innocence Project. At that time, the Montana Innocence Project was diligent in trying to obtain the physical evidence in this case. It was very difficult for the innocence project to do so. At first, they believed that it was residing with the U.S. Attorney's Office. They then had to go to the tribal court and the tribal system. And you'll see in the record the affidavit of Steve Cochran that says that the evidence was maintained by the tribal court. If you argue primarily, though, that the exception is the newly discovered DNA evidence, and assuming that I would think it would generally apply, does this have any time limit? That's a very good question, your honor. I asked it. I know. It does not appear to. It does not. Well, maybe it's the newly. And maybe it is the newly. The newly since when? Our argument is, of course, that it's after the conviction. That any evidence discovered after the conviction that is new DNA evidence Does that mean that if you have newly discovered evidence one year after the conviction that you can file a timely application ten years after the conviction, or do you mean that? Well, I guess, again, it kind of depends on the circumstances of the case. And that's not the case here, right? And it also depends on what do you mean by newly discovered DNA evidence and what are you going to attribute? You made a very interesting argument about that, and it had some appeal to me. I mean, basically, the evidence that you put in front of the jury is not a cotton swab in a plastic bag. The evidence you put in front of the jury is an expert witness who testifies about what it means. So the cotton swab may be old evidence, but the testimony based on new methods may be new evidence. That sounds good, but the language of this subsection B2 says the evidence to be tested is newly discovered DNA evidence. And where it says the evidence to be tested, that looks to me like that means the cotton swab. That's correct. So why wouldn't they – so it can't – even though the testimony may be based on new methods, it's sort of hard to say that evidence means the new methods in the last part of the sentence when it obviously means the cotton swab in the first part of the sentence. Well, for this case, Your Honor, I'm not sure it matters because the cotton swabs were never tested for DNA evidence. The shorts were never tested for DNA evidence. I thought they were, and there was nothing definitive. There wasn't enough of any ejaculate in there to link it to a particular man. I thought that was true only of the underpants. Is that right? That's right. That's correct, Your Honor. Also, it's newly discovered DNA evidence. So here what's new about it, and this may be special to this case, is that you can now get at the DNA when you couldn't before. It isn't a different way of testing DNA. It's a new way – it's a different way of getting at DNA that you couldn't get at before. So what's newly discovered is the DNA because you couldn't get at it before. Exactly, Your Honor. I think that's precisely an issue here, and that's why I said it doesn't – And it wouldn't necessarily apply to any new methodology. If you had, for example, you had the DNA evidence and it was testable before, and now you're going to test it in a different way, that would be different. Very good point. Exactly, Your Honor, because, for example, the vaginal swabs were tested for semen, and then no more testing was done. The shorts were never tested, and now we have touch DNA to test the shorts. The hair was considered too degraded to test, and now we can test the hair. So you never got anything about the DNA off those objects. That's correct. Partially because the technology hadn't developed at that stage, or simply choice? Technology had not developed at that stage, Your Honor. So your argument, then, is that the DNA, which can now be discovered, is the newly discovered evidence? That's correct. That's exactly right. So it's not the technology is what I'm trying to be clear about. It's not that the technology is new. It's that you can now get a DNA that you couldn't get at before. So it's essentially.  But we're still bothered by the newly. What do we do with that? Well, you shouldn't be bothered by the newly, number one. Okay. Because if that evidence that we now have could have been introduced. We don't even have it, but we might be able to get it. If we were able to get it. I think what this statute provides us is the opportunity to do exactly what we're asking for here. What we have is a DNA technology that we can now test on physical evidence, and we can go back and look at that physical evidence to see whether or not our client was involved in the case at all. And so breaking it down to does newly mean within X amount of time of when the motion was filed, or does newly mean within a few years after conviction. We don't really, I don't think, need to define newly that particularly here. What we can say is, look, this wasn't used at trial. Our client can now have DNA evidence that really is very probative. It can essentially undermine the physical evidence that was used against him. When you think about it, the eyewitness testimony here was that there was a full penile assault, and then the doctor's testimony was that there were minute tears, perineal tears. Well, once we have DNA testing of the vaginal swabs, and based on Greg Hampinkian's affidavit, we can now test those DNA swabs to see if there is male DNA on them. We couldn't do that in 2006. Now we can do that. And so we undermine the essential physical evidence. We also had that on the panties, the semen was too small and degraded in a sample to be able to test at trial. The ultimate standard under the statute. I mean, the concern in having the, it's not a limitations period as such, it's a presumption. But the reason it went into the statute as I understood it was because of the concern of people waiting a very long time. But whether that really, how much that matters depends on what ultimately has to be shown to get proven innocence under the statute. And what does have to be shown? Well, first of all, I think that that is exactly right. This is a very strict statute, right? There are a lot of elements that have to be shown. I don't mean to get the evidence, but to use it once you've got it. Suppose you've got it, and suppose it proves what you hope it will prove, then what happens? Well, all the evidence has to show under the statute is under subsection 8. And it says the proposed testing of the specific evidence may produce new material that, one, would support the theory of the defense, and two, raises a reasonable probability that the applicant did not commit the offense. That's what we need. If he gets that, does he then go back and file a habeas? What does he do with it at that point? Well, then there's the testing procedures, and then there's a discretionary procedure within which you file a motion for new trial. And there's a lot of other details that go on with respect to the subsequent, once we get the DNA. I think what surprised us here was that even though the Montana Innocence Project offered to pay for this testing, they were, I mean, we were actually surprised that we were not allowed to just even just do, and once the physical evidence was tracked down, we had new technologies, we were not allowed to test it. Is it in the record that the Montana Innocence Project volunteered to pay? I had the impression that the government often opposes these things because they don't want to be flooded with things that will cost them $80 each or something. It is in the record. I believe that it's in the transcript of the oral argument, and I believe it's also in the original briefing that the Montana Innocence Project offered to pay. They may not be pleased that I reiterated that, however. I'm going to reserve the rest of my time for my rebuttal, Your Honors. You may do so, Counsel. Thank you. May it please the Court, my name is Laura Weiss, and I represent the government in this case. If they want to pay for it, why not? Right. I mean, it may turn out to be this fellow's semen, and it's all over. Two reasons. The first is that the way that the statute is set up, there is an interest that Congress has expressed in finality, that we don't want to Well, it's not a very strong one. It's not written as a limitations period. It's pretty much the opposite of an interest in finality, actually. They're saying you can reopen these things, even though they've been all through all the final procedures, and it was a response to all those innocent people that went to prison for rapes they didn't do. Right, and I think there's a concern, at least in this case, especially in relation to factors six and seven, which is something I do want to address, because these are in a serial order. So when we're looking at the factors that Congress has said On six and seven, I think in the final argument, mention was made that there was a showing that there was male semen here, and I can't see why the showing that it's not Watson's would not at least be relevant to showing that his identity under seven as the rapist is not established, and it would raise a reasonable probability that he didn't do it. Right, so under the factor about the identity of the perpetrator was not an issue at trial, it has to be an issue in this case? Well, it was an issue. His defense, as I understand it, was it wasn't me, I didn't do it, and if anybody did it, it could well have been somebody else, like the brother. Well, my understanding of his testimony at trial was not that he didn't, the brother didn't recognize me when I came in, that wasn't the issue, it wasn't his identity, it was his conduct. I mean, there's case law in general that says that that's not what identity means, and identity means, we don't have to believe that the brother, I mean, he was believed at trial because there was no counter evidence, but if there had been counter evidence, i.e., that it was somebody else's semen, the brother might have known who he was, but he might have been making up the whole story about what he was doing. Well, here's the problem. So we do identify, the trial transcript does reveal evidence that there was semen identified in the panties. The evidence that came in at trial about those panties, as the court likely knows, is that those were placed on the victim. So what? She could have leaked it, she could have been on her. I mean, this seems incredible nitpicking. I mean, if it turned out that it was the brother's semen on the panties, you don't think that would go to the identity of who the criminal was and say something about whether he was actually innocent? I don't think it would prove actual innocence. I think as for proof, anything could happen. I mean, even if it was Watson's semen, it could be he was having sex with the mother and it was the mother's panties. And if it's not Watson's semen and it's somebody else's semen, it could be that he just didn't even get to the pre-ejaculate stage, but he still penetrated this drunk girl. However, it would create a probability or increase the probability that he's not the one who penetrated the girl. And he said, if anyone did it, it wasn't me. I just went to the bathroom in the master bedroom and I was walking out. I didn't have sex with this girl. Well, finding out whether it's his semen would really bear on that. And I think the imperative issue in that inquiry is what's the standard here? And Ms. Griffin indicated she mentioned that it would undermine evidence if someone else's semen was undermined. But also, this isn't all of it. There was also the vaginal swab, which might have shown something. There was also they're now saying touching. There's evidence now that you can get which wouldn't even be the semen. It would be whether he touched her or didn't touch her. So why isn't this all pertinent? Why don't you want to know it? That's what really bothers me. I mean, why does the government, especially if they're paying for it, what's the interest in throwing up barriers? Right. And I think that it needs to be made clear that the government does not have an interest in denying innocent people the ability to prove their innocence. And so what I'd like to do is go through. So the evidence exists. They're willing to pay for it. Let's talk about that factor, right? Let's talk about item by item. And so what you're asking is whether or not the inquiry under that factor 7 is whether or not this theory of the redundant absence of DNA will prove his actual innocence. Does it say prove his actual innocence? Under the factor. It says prove his actual innocence. And I think that's where this case turns. Because if you go item through item under factor 7, if the idea of redundant absence of DNA. It doesn't say prove actual innocence. It says support the theory of defense, raise a reasonable probability that the applicant did not commit the offense. This is not like the Schlupp gateway. It doesn't use Schlupp gateway language, which is what you're using. Right. May I – hold on just a moment, Your Honor. May I get my brief? Sure. You're using Schlupp gateway language, but the statute uses something that's much more liberal about letting this go forward. Right. And so even under that standard, under the items, listing the items, and I'll be very quick about it, but when we're talking about, you know, why does the government – what's the problem with testing the semen in the underwear? We may have an instance here where they find semen of the mother's partner. Does that raise a probability that the partner of the mother the night before or the night before that committed this attempted rape? That is backwards. If the only semen they find there is the mother's partner, it would tend to reduce the probability that Watson raped the girl because none of his semen is there. The jury here was told, and I was very troubled by this actually, that they couldn't – that the expert couldn't exclude Watson. Well, of course she couldn't exclude Watson because she couldn't exclude anybody. Right. She couldn't exclude any of the males in this courtroom. Right. And she actually couldn't exclude the males from the population. And so when you look at the conviction itself – that she testified that she couldn't exclude him. Just like that he said it, which is a little misleading, to put it mildly. Well, and I think the problem there is that you've got testimony that – there's another case that actually references a very similar case to this in which a similar scenario played out where there was testimony at trial that no male could be excluded. Whether or not the redundant absence of DNA could increase the possibility of – But it isn't only – it's a cute phrase, redundant absence. But that isn't really what they're looking for. They're looking for someone else's DNA. And if that's the result, we may find ourselves in a situation where you have someone who either, say in regard to the panties, had sex with the mother the night before. That doesn't prove – What about the swab? I'm sorry? What about the swab? It may be the case, and I would make no assumptions about the victim in this case, but we often have Indian country cases where we have results from the DNA lab that come back and it has DNA of two or more individuals. Okay. Well, doesn't that say something about whether he was the guy? It may not. If his actual conviction is – if his actual offense of conviction, which he put in his application, is attempted sex abuse, attempted, the presence or absence isn't dispositive to whether he committed attempted sex abuse. It's not absolutely dispositive. You're correct about that. But because of the DNA in the pre-ejaculate, it's probative. If both the mother and the daughter have had sex with other people, but there is no DNA showing sex with Watson, it reduces the probability that Watson had sex with the daughter. It doesn't absolutely rule it out, but it reduces the probability. And that's all you need, as far as I can tell, under this language in subsection 8. And, Your Honors, I actually apologize. I had sort of a lapse in reading my notes. Our argument – and I again apologize. I've got six minutes to explain myself on this, but I was operating under factor 6. So the applicant identifies – and this is the fact that this court – A theory of the defense that was established is actually – is that 8 says the proposed DNA testing produced new materials that would support the theory of the defense. So the theory of the defense was I wasn't the one who committed the rape. That's the theory of actual innocence. And the proposed DNA testing that would support the theory is that you find DNA evidence of somebody else, either on the swab or on the panties or whatever. So I don't understand this argument. Why don't you go back to the time of this argument? That one seems a lot more promising from your point of view, it seems to me. Right. And if I just may briefly address in factor 6, just before moving on to that, as you've requested, the applicant identifies a theory of defense that would establish actual innocence. Retesting of all of these items would not diminish – No. It says a theory of defense. This doesn't go to the evidence. The evidence is covered by 8. This is a theory of defense. The theory of defense is I didn't commit – I did not rape this girl. That's the theory of the defense. Either nobody did or someone else did, but I didn't. That's the theory. That's actual innocence. That's his theory under factor 6, is that what you're saying? Right. Right. And so what I am saying in response to that is that is essentially his argument that was already – it's a repackaging of the argument that he made on the direct appeal. Because 8.6 requires that it be not inconsistent with an affirmative defense. It says opposed to something where the DNA really wouldn't bear on his theory, I didn't do it, but would instead bear on mental state or mistake or coercion or some other sort of defense. Right. And I wish I had this – What I understand to be saying is if your theory of trial was self-defense, you know, I did hit him, but it was in self-defense. You can't come up now and say I didn't hit him. Right. I understand what you're saying. And I wish I had the – this may be a case like the cases before where I'm able, if the court requests it, to submit something in this regard. But there's actually a case, and I wish I had it at the ready, that essentially stated that under that factor, the mere assertion of I didn't do it doesn't satisfy factor 6. And that's what we're talking about is his theory of defense. I put it not to satisfy factor 6. Well, counsel, why don't we get to factor 10, and particularly 10b-2. Do you concede the other side's contention that this is newly discovered DNA evidence? In other words, it's the product of the analysis of the bodily fluids, which could not have been done at the time of the conviction. We disagree with their assertion. Why? Under that factor. Why? And so the phrase that we're now analyzing is, the evidence to be tested is newly discovered DNA evidence. And I think it's in the briefing, but we begin with the plain language of the statute. And if Congress had intended, as it did actually state in other sections of the statute, if it intended newly discovered DNA evidence to mean new methods on old evidence. But that's not it. By new methods, we're talking about the material, the genetic material that constitutes DNA. Right. It seems sort of difficult to wrap one's head around, because we don't know that it's there until it's tested. That's true. But this is an unusual case, because the new methodology is not new methodology to test DNA that had already been extracted. It is the ability to extract DNA that you couldn't do before, so it's new DNA evidence. Right. And I think one of the cases that could help shed light on this inquiry is Patera, United States v. Patera, that 675F3D122 from the Second Circuit. Now, is that in your brief? Yes, Your Honor. And that case from the Second Circuit essentially involved an individual who was the head of a criminal drug-slash-robbery ringleader where he murdered several people and actually dismembered them. So his theory was that his accomplice did it, and there was a FOIA request which actually found undisclosed evidence. So, in essence, newly discovered evidence. It was a scarf, a suitcase, a mask, a handgun, a rifle. And so his argument was essentially sort of what they called a speculative forensic twist, which was if they find this other individual's DNA on the evidence, then it shows his own innocence. And what the court said there is they referenced the other evidence, and I'll get to why this applies. They referenced the other evidence that came in in the case, which was, for example, the jewelry was found in the defendant's home from the victims, as well as there was evidence of wiretapping, talking about dismemberment. The way that this case applies is that when you look at the evidence that was presented at trial, the absence of DNA or anything. It sounds like what they're saying in that case is the other evidence is so strong that DNA really wouldn't matter one way or the other. Exactly. But in this case, it's just a swearing match between the brother and Watson. I'm sorry. In this case, it's just a swearing match between two people, the brother and Watson. The brother says he did it. Watson says they didn't do it. And respectfully, I disagree in that regard. In reviewing the record in this case, there is testimony about the number one from the doctor, about the bruising in her vaginal area. The doctor's testimony didn't really show much, and it didn't show that Watson did it. Right. She says there was no evidence of penetration. There were some marks on the perineum, as I recall, that could result from attempted intercourse or could result from something else. The perineum bruising, is that what you're referring to? Yeah. Yeah. The DNA retesting would not impeach the eyewitness testimony. But you've completely gotten off the judges scale last year, which is factor 10. This case has nothing to do with it, right? Well, under factor 10, so I'll go back to factor 10, this assertion that the language of newly discovered DNA evidence means what we're talking about here, the plain language does not tell you that. But you told us to go look at the Second Circuit case, which is irrelevant. Is that right? Well, I was talking about factor 6. But under factor 10, to address your question, we disagree with their interpretation of the language. Statutory interpretation, as we know, always starts with a plain meaning. Were you citing Patera for that? I wasn't, Your Honor. Oh, sorry. And I'm sorry to have gotten off the mark if we were talking about a different argument. What is your best case on your theory? Well, I think under – and I know we haven't talked a lot about it, but I think under the de novo standard, the best argument is under factors 6 and 7. And then in reference to – No, we're talking about 10b-2. What is your best case with respect to the construction you would like to place on that language? Right. The best argument that we have, and it's under the plain language of that statute, is we're talking about new evidence. For example – Okay. But you have no case. Well, and I'm sorry. In reference – and I apologize. In reference to Patera, I was talking about it because that evidence is – Well, that's just a standard review. That's all it says. Well, it's a new – it's new evidence. Right? So, for example – Questionable law subject to no review. That's all it says, isn't it? Well, in reference to factor 10, what I'm trying to convey is that it's not DNA found with new technologies. That's not what I'm – I've been thinking about Judge O'Scanlan's question since he first asked it, and there's something that's occurred to me that I'd like you to address. It used to be you couldn't see bacteria. If you get an ordinary microscope, it might be – you might have three powers, 60, 250, and 500, and you can't see bacteria. You couldn't see bacteria in a microscope until a fellow named Graham developed a stain that would turn a lot of them purple, and microscopes were developed that could see clearly at 1,000 power and even up to 3,000 power. You didn't need an electron microscope, but you needed way better ones. So, in 1850, you couldn't see bacteria. In 1950, you could see bacteria. It sounds like this change in the DNA evidence is kind of like Graham developing a stain and microscopes improving to where what you couldn't see before you can see now. Is that analogous? And if so, why aren't the bacteria in my hypothetical and the DNA in this case newly discovered evidence? Well, I think that hypothetical is consistent with Ms. Griving's argument about this, that that means that the definite – the plain language means the example that you're giving, right? It's the things that we cannot see with new DNA evidence. Our argument is, under the plain language of that statute, that's not what Congress intended under analysis of that section. It's actually the evidence to be tested. Well, the bacteria were in the blood, but they were invisible before Graham and the improved microscopes. So, they're not newly discovered evidence, even though they weren't discoverable? Because you had the blood sample? Right, and I think that's consistent with Ms. Griving's argument. My analogy, I guess, in a situation like this would be, you know, we proceeded through trial, we have a conviction, and two years later, an agency discovers a sock that somehow had some relevance to this case. But that's not what it says. It doesn't say newly discovered evidence. It says newly discovered DNA evidence. Right. Counsel, your time has expired, and we understand the position that you're trying to explain. Thank you. We'll hear from Ms. Griffing. She has some reserved time. Thank you, Your Honors. We don't have much to add to what we've already said. I would say that the microscope theory is actually right on and consistent with our argument. So, you would agree that this wouldn't apply to my hypothetical, which said we have a new way of looking at the same DNA evidence we already looked at. In other words, we can look at it better now. We can get down to a more precise number or something. But still, we already have the DNA evidence. We can just do it better. That's correct. That's not the situation. That's not what we're doing here. That's not the situation we have here. I very much agree. Counsel, let me just ask you, is there a possible waiver issue here? When the judge said that we don't have new evidence, what we have is a request to retest with a new technique existing evidence. Does anyone disagree with that? And Mr. McQuillan says that we do not disagree with that. Now you're arguing a whole new concept here. So, Judge Haddon said, do you agree that we're just retesting new evidence? I'm sorry. Well, I'm taking it from the transcript, page nine of the transcript. What we have here factually is, and I think that's undisputed in the record, that we don't have new evidence. What we have is a request to retest with new techniques existing evidence. Does anyone disagree with that? And Ms. Weiss says no. She doesn't. And Mr. McQuillan, I gather, who argued your case there, do you disagree? And McQuillan says we do not disagree with that. So I'm just concerned. Have you waived that argument? No. Has the government raised the waiver? Has the government argued that you waived the argument? No. It has not argued any kind of waiver. And the reason it's not waived is because it's a very broad statement that the district court is making. It's really a broader statement than the subset within which we're arguing it now. So he says, are you agreeing that we want to retest this evidence? Well, yes. We do want to retest the evidence. But does that mean we want to retest DNA? The evidence isn't the panty or the underwear and so forth. It's the newly probative genetic material. That's correct. That's the essence of your argument now. That's correct. But isn't what Judge Haddon was saying. I don't think it was what Judge Haddon was saying. And at that time, he was mostly concerned about, do you have a newly discovered sock? Do you have a newly discovered shoe? Do you have a murder weapon? And what we're saying is, yes. We don't have any argument that the same physical evidence we want to test now was the physical evidence. Well, it may turn out to be not consequential because the government obviously hasn't raised the waiver question nor the possibility that they were prejudiced by that argument or that response. That's correct. That's correct. Anything further, counsel? You know, I really don't, unless the court has more questions. Thank you. Thank you. I see no further questions. Thank you very much, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Kleinfeld, Berzon